UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| HARTFORD FIRE INSURANCE | * | |
| COMPANY and FEDERAL | * | |
| INSURANCE COMPANY, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Action No. 07-11140-JLT |
| | * | |
| CNA INSURANCE COMPANY, | * | |
| (EUROPE) LIMITED, | * | |
| | * | |
| Defendant. | * | |
| | * | |
| and CNA INSURANCE COMPANY | * | |
| LIMITED | * | |
| | * | |
| Rule 19 Defendant. | * | |

MEMORANDUM

January 12, 2010

TAURO, J.

I.      Introduction

Plaintiffs Hartford Fire Insurance Company ("Hartford") and Federal Insurance Company

("Federal") (collectively, "Plaintiffs") bring this action against Defendants CNA Insurance

Company (Europe) Limited ("CNA Europe) and CNA Insurance Company Limited ("CNA

Limited") (collectively, "CNA" or "Defendants") to enforce a combined liability policy issued by

CNA Europe to European Colour plc ("European Colour").  This insurance coverage dispute

arose out of a wrongful death action (the "underlying action") brought by Gail Custadio,

Administratrix of the Estate of Stephen Custadio, against the Plaintiffs' and Defendants' mutual

insured, European Colour plc ("European Colour"), after a fatal accident at a factory owned and

operated by a European Colour subsidiary.

Presently at issue are Parties' cross-motions for summary judgment.  For the reasons set forth below, Plaintiffs' Motion for Partial Summary Judgment on Counts I and II of the First Amended Complaint [#75] is DENIED and Defendants' Cross Motion for Summary Judgment [#85] is ALLOWED.

II.      Background

         A.      The Underlying Action

The decedent, Stephen Custadio, was employed as a maintenance supervisor in a manufacturing plant owned by Roma Color, Inc. ("Roma Color"), a subsidiary of European Colour, in Fall River, Massachusetts (the "Fall River Facility").  On November 20, 2003, Mr. Custadio was attempting to fix a jammed materials lift (the "accident lift") when it unexpectedly plunged two floors.  As a result of the sudden fall, Mr. Custadio was impaled on a four-foot metal pipe through the skull and eye socket, an injury that resulted in death.

On February 4, 2005, Gail Custadio brought a wrongful death action against European Colour in Bristol County Superior Court.  The suit was then removed to this court on March 22, 2005.[1]

The complaint in the underlying action alleged that European Colour "controlled, supervised, directed and/or was involved [in] and responsible for the operation, safety, and supervision of Roma Color . . . and owed a duty to Roma Color . . .employees to ensure a safe

_____

[1]Custadio v. European Colour Plc, No. 05-cv-10556-JLT.

work place."[2]  Mrs. Custadio alleged that her husband "suffered fatal injuries" and "endured

conscious pain and suffering" as a result of European Colour's "carelessness, negligence and/or

gross negligence."[3]

      B.     <u>Relevant Insurance Policies</u>

European Colour is a public limited company organized under the laws of the United

Kingdom.  Its principle place of business is located on Hempshaw Lane, Stockport, Cheshire,

England.  At the time of the accident, European Colour was covered by three insurance policies

relevant to this action: (1) a "Special Multi-Flex" insurance policy issued by Hartford (the

"Hartford policy"), (2) a "Commercial Umbrella" policy issued by Federal (the "Federal policy"),

and (3) a "Combined Liability" policy issued by CNA Europe  (the "CNA policy").

The Hartford policy, issued to Roma Color as the first named insured, listed European

Color as an insured.  It provided a primary layer of commercial general liability coverage with a

limit of one million dollars ($1,000,000) per occurrence.  The Federal policy, also issued to Roma

Color as the first named insured, extended coverage to European Colour.  That policy carried a

limit of five million dollars ($5,000,000) per occurrence.

The CNA policy provided a primary layer of liability coverage up to a limit of two million

pounds sterling (£2,000,000).  Section 2 of the CNA Policy ("Public Liability") restricts the

geographical scope of public liability coverage for "[a]ccidental PERSONAL INJURY to any

---

[2]Pl.'s Mem. Supp. Summ. J. Ex. 1, <u>Custadio</u> <u>Compl.</u> at ¶ 7.

[3]<u>Id.</u> at ¶ 9.

person"[4] to certain "Geographical Limits."

The "Geographical Limits of Section 2" are defined in the following manner:

3.1     The UNITED KINGDOM and offshore installations within the continental shelf
        around the UNITED KINGDOM;

3.2     Elsewhere in Europe but only in connection with the Business carried on by the
        INSURED at or from any premises situated in the UNITED KINGDOM;

3.3     Elsewhere in the world other than the United States of America or Canada arising
        out of business visits by directors or non-manual EMPLOYEES ordinarily resident
        in the UNITED KINGDOM.

4.      EXTENSION TO SECTION 2

        Unless expressed to the contrary the Extensions to this Section are subject to all
        other terms of this POLICY so far as they can apply.[5]

Plaintiffs Hartford and Federal argue that geographical limitations cited above did not

apply to the underlying action.  Rather, they rely on another provision, Paragraph 4.4 of Section 2

("Clause 4.4"), in arguing that the underlying action falls under an extension of coverage afforded

under Section 2, circumventing more general geographical limitations.

Clause 4.4 provides, in pertinent part, that the "INSURER will indemnify the INSURED

under this Section against liability in respect of PERSONAL INJURY or physical loss or damage

to PROPERTY happening anywhere within the United States of America or Canada arising out of

business visits by directors or non-manual EMPLOYEEs . . . [p]rovided that . . .[s]uch directors

---

[4]Pl.'s Mem. Supp. Summ. J., Ex. 5 at Section 2, ¶ 1.

[5]Pl.'s Mem. Supp. Summ. J., Ex. 5 at Section 2, ¶ 3 (emphasis added).

4

and non-manual EMPLOYEEs are ordinarily resident in the UNITED KINGDOM."[6]

In turn, the term "employee" is defined, in pertinent part, to include "any person under a contract of service or apprenticeship with the INSURED" and "any person under a contract of service or apprenticeship with another employer who is hired or borrowed by the INSURED."[7]

C.    <u>CNA's Refusal to Defend the Underlying Action</u>

European Colour's insurance broker, Aon Limited, put CNA on notice of the underlying action on March 11, 2005. During 2005, CNA repeatedly denied that the policy it issued to European Colour covered Mrs. Custadio's claim against European Colour, indicating that "the territorial limits include [the] USA but only in respect of product liability claims."[8]

In early 2007, after being provided with discovery materials from the underlying action by plaintiffs, CNA informed counsel to Hartford and Federal that, under the CNA policy, in order for a "claim to be covered under clause 4.4 of the CNA policy, there must be a direct causal connection between the business visits and the personal injury. We have seen no evidence suggesting such a connection."[9] And, though CNA admitted that European Colour "directors and non-manual employees did make numerous business visits to the US," CNA contended that its

---

[6]Pl.'s Mem. Supp. Summ. J., Ex. 5 at Section 2, ¶ 4.4.

[7]Pl.'s Mem. Supp. Summ. J., Ex. 5 at "General Definitions," ¶¶ 5.1, 5.3.

[8]Pl.'s Mem. Supp. Summ. J. Ex. 27, March 18, 2005 Letter from Steve Mottram, Aon Limited to Paul Steventon, CNA Insurance Company (Europe) Ltd.

[9]Pl.'s Mem. Supp. Summ. J. Ex. 28, February 14, 2007 Letter from Richard Smith, CNA Insurance Company Ltd. to Clyde & Co.

policy did not cover Mrs. Custadio's claim because "their conduct during those visits was not the proximate, effective or dominant cause of the accident, nor was it a necessary consequence of the visits."[10]  CNA also asked Hartford and Federal to delay their contribution claim against CNA "pending the outcome of the action against [European Color]."[11]

Subsequently, in a Particulars of Claim filed by CNA in the High Court of Justice, Queen's Bench Division, Commercial Court, on April 11, 2008, CNA argued that "[a] liability of European Colour PLC could only arise out of a business visit or visits where there was a causal connection between the business visit or visits in question and the liability in respect of personal injury happening within the USA which European Colour came under."[12]

### D.    Relevant Discovery from the Underlying Action

Since the crux of this dispute is whether Mr. Custadio's accident "ar[ose] out of business visits by directors or non-manual employees," the facts pertinent to this litigation relate to visits by European Colour employees to the Fall River Facility.  This court presents the following facts in a light most favorable to Plaintiffs, as they do not prevail on summary judgment.[13]  The fact that there are cross-motions for summary judgment pending does not affect this court's assessment of the relevant facts.[14]

---

[10]Id.

[11]Id.

[12]Pl.'s Mem. Supp. Summ. J. Ex. 30, Particulars of Claim at ¶ 19.2.

[13]See Alliance of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 34 (1st Cir. 2005).

[14]Id.

1.      **Phillip Myles**

Phillip Myles, the Chief Operating Officer of European Colour until a few months prior to

Mr. Custadio's accident,[15] made approximately eighteen visits to the Fall River Facility in total.[16]

Mr. Myles was one of the individuals responsible for oversight of health and safety conditions at

the Fall River Facility.[17]  Mr. Myles indicated that he had a number of general safety concerns

regarding the Fall River Facility.[18]  For instance, Myles observed Ned Almeida, Mr. Custadio's

supervisor, working in Roma Color's dangerous ice-making machine without a harness, despite

Mr. Myles' admonition to wear one only minutes earlier.[19]  And, even though Mr. Myles had the

authority to fire Mr. Almeida at the time, and considered that course of action, he opted instead to

orally reprimand Mr. Almeida.[20]

Mr. Myles also had several discussions with employees at the Fall River Facility about the

accident lift prior to the time of the accident.  He spoke with Michael Clayton, Roma Colour's

General Manager, and John White, Roma Colour's Technical Director, on approximately three

separate occasions in 2001, two years before the accident.[21]  Mr. Myles described the purpose of

---

[15]Pl.'s Mem. Supp. Summ. J. Ex. 11, Myles Dep. at pp. 11, 23.

[16]Pl.'s Stmt. Mat'l Facts ¶ 12.

[17]Pl.'s Mem. Supp. Summ. J. Ex. 11, Myles Dep. at p. 78.

[18]Pl.'s Mem. Supp. Summ. J. Ex. 11, Myles Dep. at pp. 58-59.

[19]Pl.'s Mem. Supp. Summ. J. Ex. 11, Myles Dep. at pp. 59-61.

[20]Pl.'s Mem. Supp. Summ. J. Ex. 11, Myles Dep. at pp. 62-66.

[21]Pl.'s Mem. Supp. Summ. J. Ex. 11, Myles Dep. at pp. 34-38.

those conversations as "two fold because it was predominantly linked to capacity . . . to store. The plan was we had two options, have the lift go to the top floor so that goods could be stored there, or Fall River's Mike Clayton and John White's preferred option which was to move, to build a laboratory on the top floor instead, releasing capacity in the floor [to] store more goods. However, my particular concern was that the inventories were too high therefore there was no real need for capacity reasons."[22]  Mr. Myles testified that the lift "looked well maintained" but could not determine its condition.[23]

Mr. Myles also prepared a 2003-04 business plan for European Colour which included a Request for Capital Expenditure (the "Capital Request") for £96,000 for an unidentified "replacement lift."[24]  The Capital Request stated that the replacement lift was "needed for safety reasons."[25]  At his deposition, Mr. Myles testified the Capital Request did not relate to the accident lift,[26] but rather to the receiving lift, one of several other lifts at the Fall River Facility.[27] George Hughes, European Colour's Sales and Marketing Director, initially testified that the Capital Request pertained to the accident lift,[28] but, later in his deposition, testified that it related

---

[22]Pl.'s Mem. Supp. Summ. J. Ex. 11, Myles Dep. at pp. 38-39.

[23]Pl.'s Mem. Supp. Summ. J. Ex. 11, Myles Dep. at pp. 43-44.

[24]Pl.'s Mem. Supp. Summ. J. Ex. 11, Myles Dep. at pp. 161-62.

[25]Id.

[26]Pl.'s Mem. Supp. Summ. J. Ex. 11, Myles Dep. at p. 161.

[27]Pl.'s Mem. Supp. Summ. J. Ex. 11, Myles Dep. at p. 161-3.

[28]Pl.'s Mem. Supp. Summ. J. Ex. 13, Hughes Dep. at p. 125.

to the "lift at the receiving dock bay" and "definitely not" the accident lift.[29]

2.     **Michael Cooper**

Michael Cooper, the Health, Safety and Environmental Manager at EC Pigments, European Colour's U.K. subsidiary, performed a health and safety audit of the Fall River Facility during a visit in February 2003 but did not inspect any of the lifts.[30]  According to Mr. Cooper, Mr. Clayton, Roma Color's General Manager, advised Mr. Cooper that he would rather spend money on a new "elevator" than a new ice bin,[31] a comment recorded by Mr. Cooper in his notes from the visit under the heading "H&S budget."  The notes do not specify which lift the comment related to.[32]

3.     **Neil McKinlay**

Neil McKinlay, European Color's Supply Chain Director, visited the Roma factory in October 2003, six weeks prior to the November 20, 2003 accident.[33]  Mr. McKinlay was charged with implementing European Colour's "zero standards" policy, a policy stating that for "accidents and incidents" and "community complaints" "the only acceptable number [was] zero."[34]

During his October 2003 visit, Mr. McKinlay noted many safety problems at the Fall River

---

[29]Pl.'s Mem. Supp. Summ. J. Ex. 13, Hughes Dep. at p. 184.

[30]Pl.'s Mem. Supp. Summ. J. Ex. 14, Cooper Dep. at pp. 12, 19-20, 25, 40, 49-50.

[31]Pl.'s Mem. Supp. Summ. J. Ex. 14, Cooper Dep. at pp. 121

[32]Pl.'s Mem. Supp. Summ. J. Ex. 14, Cooper Dep. at pp. 121.

[33]Pl.'s Mem. Supp. Summ. J. Ex. 12, McKinlay Dep. at p. 8.

[34]Pl.'s Mem. Supp. Summ. J. Ex. 12, McKinlay Dep. at pp. 38-39, 51-52.

Facility.[35]  He was charged with conducting a "proper inquiry of the history of the equipment [at the Fall River Facility] including the elevators."[36]  At the time of his deposition, however, Mr. McKinley could not recall whether he ever reviewed any documents on lift safety.[37]  Nor was he aware of an incident involving the accident lift that occurred in September 2003 in which it "had fallen again."[38]  He also failed to undertake any discussions with Mr. Custadio, whom he understood had "the greatest knowledge about the condition of the lift system including the accident lift."[39]

       During that same visit, Messrs. Clayton and Almeida informed Mr. McKinlay of their desire to replace the middle lift in order to "expand[] capacity" and because "if it broke or had a major failure then the factory would have to shut down and they said to me for capacity and security reasons they wanted a second lift."[40]  McKinlay discussed the subject of replacing the accident lift with George Hughes on the plane back to England after their October 2003 visit.[41]  In that conversation, Mr. McKinlay told Mr. Hughes that "you don't need to replace the lift, what

_____

[35]Pl.'s Mem. Supp. Summ. J. Ex. 12, McKinlay Dep. at pp. 54-55.

[36]Pl.'s Mem. Supp. Summ. J. Ex. 12, McKinlay Dep. at p. 41.

[37]Pl.'s Mem. Supp. Summ. J. Ex. 12, McKinlay Dep. at  p. 60.

[38]Pl.'s Mem. Supp. Summ. J. Ex. 12, McKinlay Dep. at pp. 148-49; Exh. 6, Almeida Dep. Vol. 2 at p. 82.

[39]Pl.'s Mem. Supp. Summ. J. Ex. 12, McKinlay Dep. at p. 42.

[40]Pl.'s Mem. Supp. Summ. J. Ex. 12, McKinlay Dep. at p. 49.

[41]Pl.'s Mem. Supp. Summ. J. Ex. 12, McKinlay Dep. at pp. 70-71.

you need to do is if it needs to be upgraded to put more weight on it that is a relatively small job and if there is issues around condition then that is equally relatively small and I think we would be wasting our money putting over $100,000 into a new one."[42]

4.    **Stephen Smith**

Stephen Smith, Chairman of the Board of European Colour and the author of the zero standards policy, also visited the Fall River Facility in August, September, and November 2003.[43] Mr. Smith visited the Fall River Facility on the same day as an incident involving the accident lift that occurred in September 2003.[44]  Despite this occurrence, Mr. Smith could not recall having any discussions relating to the accident lift on that visit.[45]  And, though he remembered discussing the accident lift on his visits to the Fall River Facility, he could not recall any discussions relating to its safety.[46]

E.    Mediation and Settlement of the Underlying Action

On April 18, 2008, Plaintiffs' English solicitors, Clyde & Co., informed CNA of an upcoming mediation in the underlying action and requested CNA's participation.  By letter, CNA declined to participate in the mediation, stating "[w]e have no liability in respect of your clients' threatened contribution claim and, while your clients' position may remain that there is double

---

[42]Pl.'s Mem. Supp. Summ. J. Ex. 12, McKinlay Dep. at pp. 72-73.

[43]Pl.'s Mem. Supp. Summ. J. Ex. 2, European Colour's Answers to Interrogs., No. 8.

[44]Pl.'s Mem. Supp. Summ. J. Ex. 2, European Colour's Answers to Interrogs., No. 8.

[45]Pl.'s Mem. Supp. Summ. J. Ex. 2, European Colour's Answers to Interrogs., No. 8.

[46]Pl.'s Mem. Supp. Summ. J. Ex. 2, European Colour's Answers to Interrogs., No. 8.

insurance, they have presented no reasoned response to our arguments."[47]  CNA also declined to

communicate with Plaintiffs' attorneys during the mediation, stating "CNA's letter of 20th April

2007 to Clyde & Co. . .clearly sets out CNA's position on the mediation."[48]

On April 26, 2007, Plaintiffs' attorney again attempted to contact CNA to discuss the

proposed settlement, requesting that CNA affirm or reject the pending settlement offer of $2.75

million.  The next day, CNA responded that its "position remains as previously communicated."[49]

In April 2007, Hartford and Federal agreed to settle the underlying action for $2,750,000,

following a mediation.  Hartford contributed $1,000,000 to the settlement, while Federal

contributed $1,700,000.[50]  In addition, Hartford contributed fees and expenses towards the cost of

defending the lawsuit in the amount of $293,188.63.  On June 20, 2007, this court approved the

settlement.

F.      This Litigation

On June 20, 2007, only a few months after finalizing the settlement of the underlying

action, Hartford and Federal filed this action against CNA.  In the First Amended Complaint,

Plaintiffs assert claims for (1) declaratory judgment regarding defendants' duty to contribute to

---

[47]Pl.'s Mem. Supp. Summ. J. Ex. 19, April 20, 2007 letter from Vikki Punshon to Clyde & Co.

[48]Pl.'s Mem. Supp. Summ. J. Ex. 21, April 26, 2007 email from Richard Smith to John McGivney.

[49]Pl.'s Mem. Supp. Summ. J. Ex. 22, April 27, 2007 email from Richard Smith to John McGivney.

[50]Pl.'s Mem. Supp. Summ. J. Ex. 19, Settlement Agreement and Release.  Fifty thousand dollars ($50,000) was also paid on behalf of L.K. Goodwin, which was not a party to the underlying action.

the litigation and settlement costs of the underlying action, (2) equitable contribution to the costs

of litigating and settling the underlying action, and (3) damages for violation of Mass. Gen. Laws

c. 93A and c. 176D, as well as attorneys' fees and costs.

III.    Discussion

A.    Legal Standard for Summary Judgment

On summary judgment, it is the duty of the court "to pierce the pleadings and to assess the

proof in order to see whether there is a genuine need for trial."[51]  Fed. R. Civ. P. 56(c)

"impose[s] on a party seeking summary judgment the burden of establishing the lack of a genuine

issue of material fact."[52]  A fact is "material" if it "might affect the outcome of the suit under the

governing law."[53]  An issue of material fact is only deemed to be "genuine" if a reasonable finder

of fact could find in favor of the nonmoving party.[54]

If the party moving for summary judgment successfully establishes that no genuine issue of

material fact exists, the burden shifts to the party opposing the motion to set forth specific facts

showing that there is a genuine issue requiring a trial.[55]  In weighing summary judgment, courts

_____

[51]Mesnick v. General Electric Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990))

[52]Merchants Ins. Co. v. United States Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998).

[53]Natal v. City of New Bedford, 37 F. Supp. 2d 74, 75 (D. Mass. 1999) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)).

[54]FTC v. Patriot Alcohol Testers, 798 F. Supp. 851, 855 (D. Mass. 1992).

[55]See United States v. O'Connell, 890 F.2d 563, 566 (1st Cir. 1989).

need not accept "conclusory allegations, improbable inferences, and unsupported speculation."[56]

Where, as here, there are cross-motions for summary judgment pending, "the court must consider

each motion separately, drawing inferences against each movant in turn."[57]     B.     Choice

of Law

The Parties agree that the court should apply English law in interpreting the terms of the

CNA policy in accordance with the choice of law provision in the contract,[58] which states that

"this POLICY is governed by and shall be construed in accordance with English law."[59]

Massachusetts courts typically honor contractual choice of law provisions where, as here, there

are no public policy considerations weighing against enforcement.[60]  This court will therefore

apply English law in construing the pertinent contractual language in this case, namely, the

meaning of the "arising out of" causation standard.

To assist in this effort, "the court may consider any relevant material or source, including

testimony, whether or not submitted by a party or admissible under the Federal Rules of

---

[56]Quinones v. Houser Buick, 436 F.3d 284, 289 (1st Cir. 2006).

[57]Merchants Ins. Co., 143 F.3d at 6-7 (quoting Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997)).

[58]Pl.'s Mem. Supp. Summ. J. at p. 23 ("the CNA policy is to be construed under English law"); Def.'s Mem. Opp'n Pl.'s Mot. Summ. J. at p. 14 ("Defendants respectfully submit that English law must be applied by this Court in interpreting the CNA Europe Policy").

[59]Pl.'s Mem. Supp. Summ. J., Ex. 5 at "General Conditions," ¶ 4.7.

[60]See Northeast Data Systems v. McDonnell Douglas Computer Systems Co., 986 F.2d 607, 610 (1st Cir. 1993).

Evidence."[61]   For that reason, both parties have submitted expert affidavits and testimony on

English law.

      C.      <u>Count I:  Coverage Provided by the CNA Policy</u>

It is clear that "the interpretation of an insurance policy and the determination of the

policy-dictated rights and obligations are questions of law, appropriate grist for the summary

judgment mill."[62]   The Parties, which have not claimed a jury trial on these issues, agree that the

construction of the "public liability" provision in the CNA policy is an issue properly reserved to

the court.[63]

      1.      **"Arising Out Of" Causation Standard**

In Count I of the First Amended Complaint, Plaintiffs seek a determination that the CNA

policy, on its face, extends coverage to the fatal accident that killed Mr. Custadio.  The crux of

this dispute is therefore whether Mr. Custadio's accident "ar[ose] out of business visits by

directors or non-manual employees."

Plaintiffs, relying on affidavits from experts in English law, urge this court to adopt a

broad interpretation of the phrase "arising out of," suggesting that this causation standard "should

not be construed in the 'limited sense' of direct and proximate cause," but rather as "some wider

_____

[61]Fed. R. Civ. P. 44.1.

[62]<u>Merchants Ins. Co.</u>, 143 F.3d at 8.

[63]<u>See</u> <u>Scottsdale Ins. Co. v. Torres</u>, 561 F.3d 74, 77 (1st Cir. Mass. 2009) ("The
interpretation of insurance contracts is generally a matter of law for the court."); <u>see</u> Plaint.'s
Mem. Supp. Summ. J. at p. 20, Def.'s Mem. Opp'n Pl.'s Mot. Summ. J. at p. 13.

test of causation."[64]

In an attempt to establish a broad interpretation of the contract language, Plaintiffs first
point to a recent decision, <u>King v. Brandywine</u>,[65] where an English court held Exxon liable for
clean-up costs incurred in the aftermath of the Exxon Valdez oil spill.  There, the court considered
"whether Exxon's consignment of its oil cargo for carriage on board the Exxon Valdez was an
'operation' within the meaning of the [insurance] policy and if so whether the liability of Exxon to
pay damages for damage to property was [*sic*] caused by or alleged to have been caused directly
by pollution or contamination 'arising out of' such operation."[66]

According to Plaintiffs' expert Jonathan Gilman, Queens Counsel, the <u>King</u> court, in
determining the meaning of the "arising out of" standard, "was guided by the Court of Appeal
decision in <u>Dunthorne v. Bentley</u> [1991] Lloyd's Rep. I.R. 560."  The <u>Dunthorne</u> court
determined that injuries incurred in a car accident "arose out of" a driver's use of his vehicle, even
though the driver, who ran out of gasoline, caused the accident after exiting his car by running
across the road to seek assistance from a passing friend.[67]   That decision, in turn, relied upon
<u>Government Ins. Office of NSW v. Green and Lloyd</u>, (1965) 114 CLR 437, a decision of the High
Court of Australia, where the court indicated that "the words 'arising out of' in similar Road

─────────────────

[64]Pl.'s Mem. Supp. Summ. J. at p. 24 (quoting <u>Caudle v. Sharp</u>, [1995] LRLR 433, 439
(CA)).

[65][2004] Lloyd's Rep. I.R. 554.

[66]Pl.'s Mem. Supp. Summ. J., Ex. A, Gilman Op. at ¶ 1.38.

[67]<u>Id.</u> at  ¶ 1.39.

Traffic legislation in Australia have a wider connotation than the words 'caused by', but still require a relationship between the use of the vehicle and the injury which has 'some causal element in it'; the words carry a 'sense of consequence', and would exclude cases in which 'the use of the vehicle is merely a casual concomitant, not considered to be, in a relevant causal sense, a contributing factor.'"[68]

In support of their broad interpretation of the phrase "arising out of," Plaintiffs also state that, while not controlling in this case, "it is noteworthy that Massachusetts law agrees with English law on this point."[69]  Against that backdrop, Plaintiffs claim that "[r]ead in light of pertinent authorities, the answers to the interrogatories, deposition testimony and document production in the Custadio Action demonstrate, with some ease, a degree of causal linkage between European Colour's liability for Custadio's fatal injury and the 'business visits by [European Colour's] directors and non-manual employees,' thereby satisfying CNA's Clause 4.4's [*sic*] 'arising out of' requirement."[70]

To the contrary, Defendants claim that English courts would interpret the scope of Clause 4.4 narrowly.  According to Defendants' expert, Colin Edelman, "[t]he decisions of the English Courts on the meaning of the words 'arising out of' in an insurance context demonstrate that those words do not have some set or broad or general meaning but rather that their meaning and

---

[68]<u>Id.</u> at ¶ 1.40.

[69]Pl.'s Mem. Supp. Summ. J. at p. 25 (citations omitted).

[70]Pl.'s Mem. Supp. Summ. J. at p. 26 (emphasis added).

ambit will be determined by reference to the context in which they appear."[71]  Defendants can

therefore distinguish several of the cases cited by plaintiffs, including <u>Dunthorne</u> and <u>Government</u>

<u>Ins. Office of NSW</u>, by arguing that in the auto insurance context "arising out of. . .has been given

a meaning which extends to results that are less immediate than the direct or proximate

relationship of cause and effect, albeit that the words still carry a sense of consequence, thereby

excluding cases of bodily injury in which the use of the vehicle was merely a causal concomitant

and not, in a relevant causal sense, a contributing factor."[72]

     According to Mr. Edelman, English courts would analyze the phrase "arising out of" in a

different manner in the insurance context.  To support this claim, Defendants rely on <u>Scott v.</u>

<u>Copenhagen Reinsurance Company (UK) Limited</u>, [2003] Lloyd's Rep IR 696, where the English

Court of Appeal weighed whether an aggregation clause in an insurance contract permitted the

aggregation of losses "arising out of one event."[73]  In <u>Scott</u>, the court held that the loss of a

British Airways Boeing 747 should not be aggregated with the loss of a Kuwaiti Airways plane,

even though they were both seized by Iraqi forces during the takeover of the Kuwait International

Airport during Iraq's invasion of Kuwait.[74]  Mr. Edelman explains that "notwithstanding that [the

British Airways plane and the Kuwaiti Airways plane] were both seized by Iraqi forces at about

the same time upon the Iraqi invasion of Kuwait and takeover of the airport in Kuwait . . . unlike

---

[71]Def.'s Mem. Opp'n Pl.'s Mot. Summ. J. Ex. H, Edelman Report at p. 13.

[72]Id. at pp.8-9.

[73]Def.'s Mem. Opp'n Pl.'s Mot. Summ. J. Ex. H, Edelman Report at p. 7.

[74]Id. at 8.

the Kuwait aircraft . . . the British Airways aircraft was not immediately misappropriated by the

Iraqis but . . . it was only later . . .that the British Airways aircraft was in fact lost" as a result of

bombing by the allied forces.[75]  In rejecting the argument that the destruction of the aircraft "arose

from" the Iraqi military's invasion and capture of the airport, the <u>Scott</u> court held that the

detention of the plane for six months "did not lead in the ordinary course of an unbroken sequence

of events to its loss" and was therefore "too remote for the purposes of the ["arising out of"]

clause."[76]  To ground liability, the <u>Scott</u> court found that "the causative link" must be "a

significant rather than a weak one,"[77]  tantamount to "but for" causation, according to

Defendants.[78]

      This court agrees with Defendants' interpretation of Clause 4.4.  It is clear that "insurance

contracts must be interpreted to reflect the intention of the parties as manifested by the policy

language."[79]  Here, the public liability provision of the CNA policy generally excludes coverage

for personal injury claims in the United States, except claims "arising out of business visits by

directors or non-manual employees."  This court is persuaded that, as Mr. Edelman proposes, an

---

[75]Id.

[76]Def.'s Mem. Opp'n Pl.'s Mot. Summ. J. at 18 (quoting <u>Scott</u>, 2003 WL 21047342 at 485, 477).

[77]Def.'s Mem. Opp'n Pl.'s Mot. Summ. J. at 17 (quoting <u>Scott</u>, 2003 WL 21047342 at 479).

[78]Def.'s Mem. Opp'n Pl.'s Mot. Summ. J. at 17.

[79]<u>Lexington Ins. Co. v. Gen. Accident Ins. Co. of Am.</u>, 338 F.3d 42, 47 (1st Cir. Mass. 2003) (citing <u>Affiliated FM Ins. Co. v. Const. Reins. Co.</u>, 416 Mass. 839, 626 N.E.2d 878, 881 (Mass. 1994)).

English court would, in interpreting "the intended ambit of the coverage," find that "CNA was only to be liable for matters in connection with a business carried on at or from [*sic*] premises in the United Kingdom, whilst elsewhere in the world it was only to be liable in respect of matters arising out of business visits by directors or non-manual employees. To construe the words arising out of so as, in effect, to impose on CNA an obligation to indemnify the insured against its liabilities from its general management activities in respect of its overseas subsidiaries would run wholly counter to the evident purpose of the policy."[80]  This court therefore agrees that there must be "a strong and close causal connection with some specific conduct on the part of the director when involved in a business visit."[81]

2.    **Analysis**

As discussed in more detail below, Plaintiffs have failed to articulate any colorable causal connection, let alone a strong and close connection, between Mr. Custadio's accident and business visits by European Colour directors and non-manual employees. Having determined the meaning of Clause 4.4 of the CNA policy, it is clear that no reasonable finder of fact could find that the contract extended coverage to the underlying action.

By advocating for a very liberal interpretation of the phrase "arising out of," Plaintiffs, in essence, read any reference to "business visits" entirely out of the contract. To do so, however, would not comport with the intent of the contracting parties, as expressed by the plain language of the CNA policy.

---

[80]Def.'s Mem. Opp'n Pl.'s Mot. Summ. J. Ex. H, Edelman Report at p. 9.

[81]Def.'s Mem. Opp'n Pl.'s Mot. Summ. J. Ex. H, Edelman Report at p. 10.

A.        Failure to Fund the Capital Request

In setting forth their argument, Plaintiffs focus in large part on European Colour's failure to fund the Capital Request to replace an unidentified "replacement lift" which was, according to the document, "needed for safety reasons."  Even accepting, as this court is required to for the purposes of this motion,[82] that the Capital Request relates to the accident lift, Plaintiffs have still not set forth any evidence of a causal connection between European Colour's action or omission in failing to approve the Capital Request and business visits by European Colour directors or non-manual employees to the United States.

For instance, though plaintiffs' belabor the point, there is no indication that a comment made by Mr. McKinlay[83] to Mr. Hughes on a return flight to England that, in his assessment, "you don't need to replace the lift," in any way influenced the company's failure to do so.  Instead, relying on deposition testimony, plaintiffs aver that "[a]s European Colour's COO and a company director, Myles could recommend capital spending to its Board of Directors.  European Colour's Board had to approve any capital expenditure for Roma Color over ten-thousand dollars."[84]  This

_____

[82]There is only thin record evidence to support plaintiffs' claim that the Capital Request related to the accident lift, rather than one of the other lifts at the Fall River Facility.  As discussed in further detail above, only one witness, Georges Hughes, testified that the Capital Request pertained to the accident lift. Mr. Hughes later recanted this testimony, stating that the Capital Request related to the "lift at the receiving dock bay," as others testified, and "definitely not" the accident lift.

[83]The court need not reach the question of whether Messrs. Cooper and McKinlay were European Colour employees, an issue the Parties vigorously dispute, since, even when considering their actions in this analysis, it is clear that Mr. Custadio's accident did not arise out of their business visits to the Fall River Facility.

[84]Pl.'s Stmt. Mat'l Facts ¶ 20.

21

court need not credit the unsupported inference that comments made by Mr. McKinlay *could have* resulted in the replacement of the accident lift.[85]  Moreover, by arguing that the Board of Directors of European Colour, rather than Mr. McKinlay, was imbued with the power to approve or deny the Capital Request, Plaintiffs implicitly concede that any action or omission with respect to the accident lift took place in England.

Perhaps in recognition of the lack of evidence on that point, Plaintiffs' assert more generally that "acts and omissions by directors and non-manual employees of European Colour during and in connection with their business visits that relate directly to the continued use of the lift on which Stephen Custadio died."[86]  But, in fact, there is simply no evidence that business trips by European Colour directors or non-manual employees in any way caused or contributed to the company's refusal to fund the request.

2.  Failure to Fire Ned Almeida

Plaintiffs also highlight the failure of European Colour management to fire "the unprofessional Almeida" for his failure to enforce safety measures.  For instance, Plaintiffs fault Mr. Myles for orally reprimanding Mr. Almeida, rather than firing him, after Mr. Almeida entered the ice bin without a harness only moments after being instructed to wear one for safety purposes. Whatever their assessment of his capabilities, however, Plaintiffs set forth no evidence of a causative link between Mr. Almeida's continued employment at the Fall River Facility and Mr. Custadio's accident.  To the contrary, in attempting to prove Mr. McKinlay's liability, Plaintiffs rely on deposition testimony establishing that Mr. Almeida requested that Mr. McKinlay replace

_____

[85]See Quinones, 436 F.3d at 289.

[86]Pl.'s Reply at pp. 8-9.

the accident lift where Mr. Custadio lost his life.

> 3.  European Colour's General Liability for Safety Problems at the Fall River
>     Facility

Plaintiffs' real theory of causation rests on general, not specific, factual allegations, that "in their numerous visits to the Fall River facility, European Colour's directors and non-manual employees assumed responsibility for safety at Roma Color, and, by their repeated acts and omissions, breached that duty despite their knowledge of the plant's state of disrepair, their concerns about the inattention to safety there - particularly on the part of Custadio's boss, the unprofessional Almeida, their control of personnel and capital expenditures, and their awareness of the need for a new middle lift given its history of failure."[87]

Put simply, Plaintiffs conflate questions of liability and causation.  This court need not determine whether or not European Colour is liable for Mr. Custadio's accident because the company is already party to a settlement of the underlying action, in which that issue was litigated.   Here, the court must perform a more limited inquiry, determining whether the CNA Policy, on its face, extends coverage to this claim.  And, since Plaintiffs have failed to adduce any evidence of a causative link between "business visits by directors or non-manual employees" and Mr. Custadio's death, the court finds that it does not.

Plaintiffs' attenuated theory of causation, if accepted, would require that CNA provide coverage for all personal injury actions occurring at the Fall River Facility because "[i]n their numerous business visits to the Fall River facility, European Colour's directors and non-manual

---

[87]Pl.'s Mem. Supp. Summ. J. at pp. 26-27.

employees assumed responsibility for safety at Roma Color," even when there is no evidence connecting any of those visits to an action or omission that relates to the relevant incident.  As stated above, that interpretation, at bottom, reads any reference to "business visits" entirely out of the contract. It also expressly contradicts the intent of the parties to the contract as expressed in the "Geographical Limits" clause of Section 2, which generally excludes coverage for the United States.  For the foregoing reasons, this court finds that the CNA policy does not extend coverage to the underlying action.

In the First Amended Complaint, Hartford and Federal also assert a claim against CNA for equitable contribution.  "Equitable contribution is . . . the right to recover . . . from a co-obligor who shares such liability with the party seeking contribution."[88]  It is well-established, however, that "there is no support in the case law of any jurisdiction for the proposition that, in the absence of exceptional circumstances, the doctrine of equitable contribution can override explicit, unambiguous policy language."[89]  Since this court has determined that the plain language of CNA policy does not extend coverage to the underlying action, and Plaintiffs have not articulated any exceptional circumstances with respect to this claim, Defendants are also entitled to summary judgment on Count II.

E.      Count III:  Plaintiffs' Claims Under Massachusetts General Laws Chapter 93A and c. 176D

Count III of the First Amended Complaint asserts that "the actions of CNA Europe and CNA Limited in their handling of the claim in the Custadio Action . . . were unfair and/or

---

[88]Lexington Ins. Co. v. Gen. Accident Ins. Co. of Am., 338 F.3d 42, 50 (1st Cir. 2003).

[89]Id.

deceptive acts or practices in violation of M.G.L. c. 176D, §§ 3(9)(a), 3(9)(b), and 3(9)(d) and M.G.L. c. 93A, §§ 2 and 11."

Defendants are correct that there is no private cause of action under c. 176D, a statute addressing unfair or deceptive practices in the insurance industry, as "[t]he Massachusetts Supreme Judicial Court has expressly 'rejected the theory that commercial plaintiffs may bring suit under Section 11 of 93A for purported violations of 176D.'"[90]  It is clear, however, that the court may consider alleged violations of c. 176D by Defendants as evidence of a violation of c. 93A.[91] Accordingly, to prevail on the claims asserted under both c. 176D and ch. 93A, Plaintiffs must establish that CNA engaged in unfair or deceptive trade practices in violation of c. 93A, § 2.

Notably, the First Circuit has held that "[a]n insurance carrier 'which in good faith denies a claim of coverage on the basis of a plausible interpretation of its insurance policy is unlikely to have committed a violation of G.L. c. 93A.'"[92]  Hartford and Federal set forth the following evidence of purported bad faith on the part of CNA: (1) statements by Richard Smith, a claims person for CNA, "den[ying] that the CNA policy provided public liability coverage for the USA"; (2) Richard Smith's failure to conduct a factual investigation before denying coverage, though

---

[90]Metro. Prop. & Cas. Ins. Co. v. Boston Reg'l Physical Therapy, Inc., 538 F. Supp. 2d 338, 343 (D. Mass. 2008) (quoting Kiewit Constr. Co. v. Westchester Fire Ins. Co., 878 F. Supp. 298, 301 (D. Mass. 1995)).

[91]See Peterborough Oil Co. v. Great Am. Ins. Co., 397 F. Supp. 2d 230, 244 (D. Mass. 2005); Alan Corp. v. International Surplus Lines Ins. Co., 823 F. Supp. 33, 44 n.4 (D. Mass. 1993) ("While the express language of § 11 does not specifically incorporate violations of M.G.L. c. 176D, case law has construed the statute so as to assume that § 11 also provides a vehicle to redress unfair claim settlement practices.").

[92]Commercial Union Ins. Co. v. Seven Provinces Ins. Co., 217 F.3d 33, 40 (1st Cir. 2000).

CNA attempted to obtain further details from the insured or its broker in other cases; (3) the insurance premium did not distinguish between product liability and public liability coverage; (4) a denial of coverage by CNA's underwriter, Paul Steventon, without investigation; and (5) "shifting reasons for denying coverage."[93]

Despite Plaintiffs' allegations, the record contains no evidence of bad faith on the part of CNA.  Plaintiffs have not adduced any evidence of a misrepresentation regarding "pertinent facts or insurance policy provisions relating to coverages at issue," in contravention of ch. 176D § 3(9)(a), since, under a proper interpretation of the CNA Policy, CNA did not extend coverage to the underlying action.  Likewise, there is no factual support for the proposition that Defendants "fail[ed] to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies,"[94] or "refus[ed] to pay claims without conducting a reasonable investigation based upon all available information."[95]  Summary judgment is therefore also appropriate on Count III of the First Amended Complaint.

IV.   Conclusion

For the foregoing reasons, Plaintiffs' Motion for Partial Summary Judgment on Counts I and II of the First Amended Complaint [#75] is DENIED and  Defendant's Cross Motion for Summary Judgment [#85] is ALLOWED.

AN ORDER HAS ISSUED.

---

[93]Pl.'s Reply at pp. 17-20.

[94]Mass. Gen. Laws ch. 176D § 3(9)(b).

[95]Mass. Gen. Laws ch. 176D § 3(9)(d).

_/s/ Joseph L. Tauro_

United States District Judge